

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 OCT 31  AM 11: 26

DEPUTY CLERK_____

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

UNITED STATES *ex rel.* SHON O'REAR
and on behalf of the STATE OF TEXAS,

        Plaintiff,

v.

AMERICARE INFUSION CENTERS,
LLC, AMERICARE INTEGRATED
MANAGEMENT, LLC, AMERICARE
MEDICAL PARTNERS, PLLC,
AMERICARE MEDICAL GROUP, INC.,
CWIDA, INC., MICHAEL GENE
SWAYDEN, and KELLY ROBERT
SWAYDEN,

        Defendant.

Case No.

## 3-16CV3039-L

**COMPLAINT**

False Claims Act, 31 U.S.C. § 3729, et seq.

**DEMAND FOR JURY TRIAL**

**FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. 3730(b)(2)**

SEALED

1311464.2

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................1

III.   PARTIES ...............................................................................................................2

IV.    STATUTORY AND REGULATORY FRAMEWORK .......................................3

    A.    Government Insurance Programs...............................................................3

    B.    Anti-Kickback and Stark Laws..................................................................4

V.     FACTUAL ALLEGATIONS ................................................................................8

    A.    Improper billing of Medicare Part B for home-based antibiotic infusion ......................................................................................................9

    B.    Double Billing of Cubicin.........................................................................11

    C.    Defendants' Anti-Kickback and Stark Law Violations ............................12

1.     Illegal Kickbacks to Referring Doctors ................................................. 12

2.     Illegal Waiver of Copays ........................................................................ 14

VI.    CAUSES OF ACTION........................................................................................15

VII.   PRAYER FOR RELIEF ......................................................................................18

VIII.  JURY DEMAND..................................................................................................19

## I.   INTRODUCTION

1.     This is an action brought by *Qui Tam* Plaintiff and Relator Shon O'Rear on behalf of the United States and the State of Texas to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the FCA" or "the Act"), and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. ("MFPA").

2.     This case involves a range of billing misconduct by Defendants, including (a) billing the government for patients obtained illegally through kickbacks and prohibited financial relationships with the referring physicians, (b) double billing the government for an expensive antibiotic, and (c) improperly billing Medicare Part B for home-based antibiotic infusions.

3.     Defendants' misconduct resulted in the submission of false claims for payment to the government under the FCA and MFPA.

## II.   JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

5.     This Court has personal jurisdiction over Defendants, because Defendants have systematically, continuously, and purposefully availed themselves of the privilege of doing business in Texas and in this District, and because Defendants' acts giving rise to the violations alleged occurred in Texas and in this District.  This Court also has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred."  During the relevant period, the Defendants transacted business in this District and acts proscribed by section 3729 occurred in this District.

6.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants can be found in, reside in, and/or transact business in this District, because a substantial part of the events or omissions which give rise to the claims alleged herein

occurred in this District, and Defendants are subject to this Court's personal jurisdiction with respect to this action.

## III.   PARTIES

7.      Defendant AmeriCare Infusion Centers, LLC is a Texas corporation with its principal place of business in Addison, Texas, and is licensed to serve as a retail pharmacy.

8.      Defendant AmeriCare Integrated Management, LLC is a Texas corporation with its principal place of business in Addison, Texas.

9.      Defendant AmeriCare Medical Partners, PLLC is a Texas corporation with its principal place of business in Addison, Texas.

10.     Defendant AmeriCare Medical Group, Inc. is a Texas corporation with its principal place of business in Dallas, Texas.

11.     Defendants AmeriCare Infusion Centers, LLC, AmeriCare Integrated Management, LLC, AmeriCare Medical Partners, PLLC, and AmeriCare Medical Group, Inc. are sometimes referred to herein as "Americare."

12.     Defendant CWIDA, Inc. is a Texas corporation with its principal place of business in Addison, Texas.

13.     Defendant Kelly Robert ("Bobby") Swayden is a citizen of Texas and is the President and Director of AIM, and Director of AIC.  He also maintains an interest in each of the AmeriCare entities, and is in active in managing their day to day operations.

14.     Defendant Michael Gene Swayden is a citizen of Texas and is the Manager and Director of AIM and Director of AIC.  He also maintains an interest in each of the AmeriCare entities, and is in active in managing their day to day operations.

15.     Shon O'Rear ("Plaintiff" or "Relator") is a resident of Collin, Texas.  Relator worked for the various Americare entities in various capacities from June 2013 through February 2016.  During that time, he served as Chief Operating Officer and Billing Manager of AIC, and later also took on the Director of Operations role for AIM.  For both entities, he focused broadly on business development, revenue cycle management, and operations.

- 2 -

IV.     **STATUTORY AND REGULATORY FRAMEWORK**

A.     **Government Insurance Programs**

16.     The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

17.     The Medicare program consists of two parts. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care. 42 U.S.C. § 1395c-1395i-2(1992). Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation physician services, supplies and services incident to physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services. 42 U.S.C. § 1395(k),(i), (s).

18.     The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of each state's Medicaid expenditures varies by state.

19.     Various other federally-funded medical coverage programs exist to help discrete populations of enrollees obtain medical care, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration, among others.

20.     Reimbursement practices under all federally-funded healthcare programs closely align with the rules and regulations governing Medicare reimbursement.

- 3 -

21.     Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b) (1994).

### B.     Anti-Kickback and Stark Laws

22.     Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE. Violation of the statute can subject the perpetrator to criminal and civil penalties, as well as exclusion from participation in federally-funded healthcare programs.

23.     The AKS also provides that claims arising out of violations of its provisions are false claims. A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42 U.S.C § 1320a-7b(g).

24.     The AKS is designed to, *inter alia*, ensure that patient care will not be improperly influenced and corrupted by compensation arrangements which are not directly related to the care of patients or which influence patient care decisions.

25.     Payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals, and remuneration offered or paid in return for the promise to send patients to a particular provider or facility qualifies as a kickback. Giving a person the opportunity to earn money for referring patients may also constitute an inducement under the AKS.

26.     The Stark Law, 42 U.S.C. §1395nn, is also known as the Physician Self-Referral Law. Implementing regulations are at 42 C.F.R. § 411.350 *et. seq.* The Stark Law prohibits submission by an entity providing healthcare items or services of claims for payment to

- 4 -

Medicare or Medicaid based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the referring entity.

27.      The regulations implementing Stark, 42 U.S.C. § 1395nn, expressly make it illegal for anyone to receive federal payment for a healthcare service that was performed "pursuant to a prohibited referral" and requires such person to "refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

28.      Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

29.      In 1993, Congress extended the Stark Law (Stark II) to referrals for ten additional designated health services (DHS) effective January 1, 1995, including (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. 42 U.S.C. § 1395nn(h)(6).

30.      The Stark Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of the designated health service." 42 U.S.C. § 1395nn(h)(5)(B). Federal regulations implementing the statute also define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare...." 42 C.F.R § 411.351.  A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

- 5 -

31.     Stark expressly prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, unless that relationship fits into one of the specific exceptions in the statute. For example, certain ownership interests in publicly-traded securities and in hospital entities are excepted. See 42 U.S.C. § 1395nn(d). Such exceptions are not applicable here.

32.     The Stark law was intended to prevent physicians from profiting (actually or potentially) from their own referrals. The Stark statute prospectively prohibits relationships that have been demonstrated to encourage over-utilization. It is a strict-liability statute.

33.     Any remuneration flowing between entities and physicians must be at fair market value for actual and necessary items furnished or services rendered based on an arms-length transaction and should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties.

34.     Whenever a physician receives compensation for services furnished to an entity pursuant to a bona fide employment arrangement with the entity, the physician is deemed to have a "financial relationship" with the entity under the Stark law in the form of a "compensation arrangement." An entity-employed medical director would maintain such a financial relationship regardless of the amount of compensation received or the manner in which it was calculated. 42 U.S.C.§ 1395nn(h)(1); §§ 411.354(a), 411.354(c).

35.     Stark includes an exception protecting compensation to be paid pursuant to such employment arrangements 42 U.S.C. § 1395nn(e)(2); § 411.357(c). In order to qualify for protection under this exception, the arrangement must satisfy the following requirements:

a.     The employment must be for identifiable services but does not have to be memorialized.

b.     The amount of compensation paid to the physician must be consistent with fair market value of the services furnished and must not be determined in a manner that takes into account the volume or value of Medicare referrals generated by the physician for the

- 6 -

entity(excluding referrals for professional services personally performed by the referring physician).

        c.      The remuneration paid to the physician must be reasonable even if no Medicare referrals were made to the entity.

    36.    Compliance with the AKS and the Stark Law are conditions of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded programs.

    37.    Claims submitted or caused to be submitted in violation of the AKS or the Stark law are false claims.

    38.    Each of the federally-funded health care programs requires every provider who seeks payment from the program to sign Provider Agreements in order to establish their eligibility to seek reimbursement from the Medicare and Medicaid Programs. As part of these agreements, without which the providers may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

    39.    When a provider submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-kickback Statute and the Stark law.

- 7 -

40.     As a result of their scheme to utilize improper financial relationships to obtain referrals from physicians, Defendants submitted and caused the submission of false claims to the United States in violation of Stark and Anti-Kickback Laws.

## V.     FACTUAL ALLEGATIONS

41.     Americare specializes in providing infusion, pain management, and related pharmacy services in the greater Dallas, Texas area.  Americare focuses heavily on home health infusion, where drugs are provided to patients for administration at home.  Within its infusion business, Americare strongly favors an expensive antibiotic, Cubicin, because the drug provides desirable profit margins when billed to the government, particularly relative to comparable drugs.

42.     When used in the outpatient setting, whether in a hospital, physician's office, or infusion center, Cubicin in reimbursed under Medicare Part B.  The drug is a "buy and bill" product, meaning that the outpatient provider buys the drug with its own funds, and then bills it to the government for a certain percentage over the "average sale price" ("ASP").

43.     Cubicin is expensive.  Whereas the long-standing alternative, vancomycin, costs about $15 per day for a typical patient, Cubicin costs between $300-$400 per day, and, for some common off-label uses, as much as $800-$1,000 per day.  The cost of Cubicin went up approximately every six months.

44.     Americare purchases the drug through Defendant CWIDA, Inc., a medical group owned by Dr. Marvin Fojtasek, which had previously signed an agreement with the drug's manufacturer, Cubist, that entitled it to a 30% discount.  Thus, Americare obtains the drug at a discounted price, but bills for it at the standard Medicare reimbursement rate described above, further increasing its profits by using the drug.

45.     Americare's focus on home health infusion led to a series of related legal violations that, in turn, resulted in false claims to government health insurance programs.

- 8 -

46.     First, Americare bills for antibiotics provided to home health care patients under Medicare Part B, in contravention of express Medicare guidelines, so that it can generate greater revenue from the drug, and to enable other aspects of its scheme, particularly the copay waivers.

47.     Second, Americare double bills the government for Cubicin single use vials: it bills portions not used on an initial patient as "waste," and then uses that product on the next patient and bills for it again.

48.     Third, in an effort to increase its infusion business, Americare pays at least three doctors for referrals and routinely violates copays for infusion patients, in violation of the Anti-Kickback Law and the Stark Law.

A.     **Improper billing of Medicare Part B for home-based antibiotic infusion**

49.     Medicare Part B covers supplementary medical insurance for services such as doctor visits, diagnostic testing, and certain medical supplies. See 42 U.S.C. §§ 1395k(a), 1395x(s). Part B reimburses providers and consumers only for those items and services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

50.     Medicare Part B benefits are administered by contractors pursuant to contractual agreements with the Secretary. See 42 U.S.C. §§ 1395u, 1395kk-1. Among other functions, these contractors are responsible for determining whether items or services billed to the Medicare program satisfy the Part B coverage requirements and, if so, the amount to be paid for such items or services. *Id.*

51.     Medicare Part B, through its contractors, does not reimburse for antibiotics such as Cubicin used in the home health care setting, a coverage determination known to Americare. *See, e.g., Ottinger v. Sebelius*, No. 2:12-CV-2, 2012 WL 5947577, at *6 (D. Vt. Nov. 28, 2012); Local Coverage Determination (LCD): External Infusion Pumps (L33794) (Oct. 1, 2015); National Coverage Determination (NCD) for Infusion Pumps, Version 2 (280.14) (Dec. 17, 2004). Americare knowingly violated this prohibition by billing Cubicin and other antibiotics delivered in the home health care setting to Medicare Part B.

- 9 -

52.     With few exceptions, Americare "treats" infusion patients by sending them home with a prepared antibiotic solution, which the patients can then self-administer.  This home use antibiotic should be reimbursed, if at all, through Medicare Part D.  That would require, however, that the patient had signed up for a prescription drug plan available under Part D, and that the particular plan cover the particular drug (most often Cubicin).  And, it would require Americare to accept the payment schedule set by that Part D plan.

53.     These Part D hurdles often would make Americare's home based infusion strategy not viable.  Undeterred, Americare simply bills Medicare under Part B, despite knowing that the drugs are not covered under Part B when administered at home.  Americare effectuates this scheme by falsifying claim forms to Medicare; specifically, it included a "place of service" modifier that falsely represented the patient was treated in office (which would permit a separate line item for Cubicin), rather than at home (which would require Cubicin reimbursement, if at all, through Part D).

54.     In addition to assuring its reimbursement, Americare's false billing to Medicare Part B gives it other unfair advantages.  First, it likely obtains higher reimbursement through Part B than it would through Part D, because the latter reimburses a fixed percentage over the average sale price ("ASP"), whereas Part D plans are able to impose stricter price controls.  Second, being able to send patients home with antibiotics gives Americare a competitive advantage over providers that comply with the Medicare billing rules and therefore could not do so as profitably, thereby enticing providers to refer their patients to Americare.

55.     In or about November 2015, Americare was audited by Novitas, a CMS contractor, regarding Americare's supposed in-office infusions, and in particular whether Dr. Fojtasek had actually treated the patients.  When Relator informed Defendant Bobby Swayden that the contractor was requesting nurse infusion notes to corroborate that the service was provided in office (thus warranting a Part B claim), and that no such notes existed, Swayden told Relator to falsify infusion notes and waste logs and send them to Novitas.  Relator refused.

- 10 -

56.     Americare was likewise unable to provide the vast majority of other records that should have been created had the infusion in fact taken place in office, including waste logs, delivery tickets, and the order from Dr. Marvin Fojtasek (under whose national provider identification number all such claims were falsely submitted).  Throughout the audit, the contractor was focused on whether Dr. Fojtasek could properly bill for the claim, i.e., whether he sufficiently participated in the patient's treatment.  The contractor did not suspect that, in fact, the patient had not been treated in office at all, and therefore should not have been billed under Medicare Part B in the first place.

57.     Americare's scheme violates material conditions of payment because, among other reasons: it provides false information to the government about the type of service provided to the enrollee; causes Medicare Part B to pay for drugs that should have been compensated separately under Medicare Part D, which the government separately funds; likely causes greater reimbursement to Americare than it would have been owed; and facilitates Americare's broader efforts to improperly induce providers to refer infusion business to it.

**B.      Double Billing of Cubicin**

58.     Cubicin is sold in a "single use" vial of 500mg.  It is administered daily and dosed per weight and infection type.  In all likelihood, a patient will never need an exact number of vials for their daily treatment.  Any leftover amount is not money wasted for the provider, however.  Instead, per the Medical Claims Processing Manual (Chapter 17, Section 40) and related guidance, the provider is permitted to bill the leftover amount as "waste" at the exact same reimbursement rate, but preferably identified as waste on a separate line item on the claim form (typically using a "JW" billing modifier).  For example, if a provider treats a Medicare patient with 400mg of Cubicin, it would bill 400mg of the drug on one line item, and another 100mg as waste on a separate line item, thus billing the government for the entire single use vial of 500mg.

59.     Americare, however, not only bills product as waste for the first patient, but also uses that supposedly "wasted" product on a second patient and thus bills it again.  As such,

- 11 -

government payors have been billed twice for the same product.  On at least one occasion, Relator sought "waste logs" that would corroborate the fact that remaining Cubicin had in fact been disposed of rather than used on a subsequent patient, but Americare staff was unable to provide that documentation.

60.    Indeed, Americare typically failed to bill waste as a separate line item, itself an indicator that it was simply billing entire vials for patients; where that vial was used twice on separate patients, they would simply bill it in its entirety for each patient.  After a Medicare audit (described below), Americare began billing the waste on a separate line, but it continued the practice of double billing the product.

61.    Americare's double billing scheme was and is material to the government, in that it caused the government to pay more than it would have had Americare billed truthfully and in compliance with all regulations.

### C.    Defendants' Anti-Kickback and Stark Law Violations

#### 1.    Illegal Kickbacks to Referring Doctors

62.    Americare pays kickbacks to at least three doctors in order to increase its infusion business.

63.    Americare entered into a pretextual "Medical Director" relationship with a key physician, Dr. Gerhard Maale, in order to pay him substantial remuneration with a purpose of obtaining Dr. Maale's patient referrals.  Americare pursued a relationship with Dr. Maale because he was known for his extensive infusion patient base, and for prescribing high quantities of Cubicin, particularly for the off-label usage of osteomyelitis, which itself requires high doses of the drug and often repeated courses of treatment.  Whereas other providers and hospitals had questioned Dr. Maale's off label usage for osteomyelitis, and liberal use of Cubicin generally, Americare viewed it as a business opportunity.  Beginning in October 2013, Americare paid Dr. Maale $10,000 per month pursuant to a written medical director agreement.  These fees do not constitute fair market value compensation for services provided by Dr. Maale, but relate instead to the value Defendants anticipate will result from the referrals.

- 12 -

64.     Dr. Maale did not actually perform any of the medical director duties required by the contract. Instead, he sometimes appears at Americare's offices for brief, so-called "collaboration meetings," typically attended solely by Relator for Americare (when he was employed there), where Dr. Maale picks up his monthly check and enters his name onto a sign-in sheet. There was no discussion of any of the directorship duties he was ostensibly being paid for. Likewise, though Dr. Maale is to document any actual directorship work performed for Americare on timesheets, in fact, the time sheets are rarely, if ever, completed or turned in. This is because he does not perform any of the contracted duties that might otherwise justify the lucrative monthly payments.

65.     Similarly, Americare entered into a pretextual physician employment agreement with Dr. Richard Buch in October 2015. Pursuant to that agreement, Americare pays Dr. Buch $2,300 per month for part-time employment of 10 hours per month. Once again, however, Dr. Buch did not and does not perform any of his contractual duties in exchange for this regular payment. In addition, Americare entered a lease agreement with Dr. Buch in October 2015 that pays over $550 per month for a portion of Dr. Buch's offices. However, Americare did not and does not actually use this space for any of its work; the lease is merely another conduit for payments to Dr. Buch for referrals.

66.     Yet another recipient of the kickbacks, Dr. Serge Lartchenko, has no such written agreements that could provide ostensible cover for the payments from Americare. Instead, every time Dr. Lartchenko refers infusion patients to Americare, he is paid a portion of the revenue Americare generates from that patient.

67.     Relator was also instructed to pay doctors, including Drs. Buch, Lartchenko, and Maale, a share of pain management revenues Americare generated from those doctors' referrals. In such cases, other than referring the patients to Americare for treatment, the doctors had no further responsibility for the patient's care and did no other work to warrant the payment from Americare.

- 13 -

68.     Americare instructed Relator to establish Provider IDs to track revenue generated by referring physicians, which in turn enabled Americare to calculate and pay referral fees as a function of that generated revenue, or, in the case of doctors receiving fixed monthly sums, to ensure that Americare was obtaining the referrals it expected in exchange for those financial relationships.

69.     Notably, while patients were referred to Americare, it billed all of its claims, including to government health insurance programs, through Defendant CWIDA, Inc., Dr. Fojtasek's medical group.  Some of the referring physicians, in particular Dr. Maale, would actually notify Dr. Fojtasek of a patient needing infusion, and have Dr. Fojtasek refer the patient to Americare, though Americare would still pay its referral fee to the initial physician that notified Dr. Fojtasek (in the example above, Dr. Maale).

70.     Once CWIDA received reimbursements for claims submitted by Americare, Defendant American Infusion Centers, LLC, the pharmacy, would sweep CWIDA's bank accounts and use those funds to pay the kickbacks described above, as well as business expenses such as salaries.  More recently, Americare has begun using different corporations for billing, including Defendants Americare Medical Partners and Americare Medical Group.

71.     These referral payments were a frequent topic of discussion between Relator and others in Americare management, including through email.  Americare principals were eager to ensure that doctors were timely rewarded for their referrals, so as to keep the referral streams active.

### 2.     Illegal Waiver of Copays

72.     Americare routinely waives co-pay requirements for Medicare and Medicaid infusion patients.

73.     While the government permits waiver of co-pays should certain financial hardship factors be met, routine waiver of co-pays is prohibited under the Anti-Kickback Statute, because it improperly induces patients to seek unnecessary care and/or more expensive care, and induces other providers to refer their patients to Americare.  *See, e.g.*, OIG, *Special Fraud Alert: Routine*

- 14 -

*Waivers of Copayments or Deductibles under Medicare Part B* (May 1991). Americare, however, never sought to confirm that a patient actually met the hardship requirements to justify the waiver.

74.     As noted, Americare's preferred antibiotic infusion drug is Cubicin, a particularly expensive drug that, in turn, generates substantial co-pays, and, in all likelihood, motivates patients and doctors to try equally effective and cheaper alternatives, such as vancomycin. Instead, by routinely and systematically waiving patient co-pays, Americare encourages use of the more expensive (and lucrative) Cubicin, and induces providers to refer patients to it. Even where a patient is prescribed something other than Cubicin, however, the waiver of co-pays serves as a powerful inducement for referring patients to Americare.

## VI.     CAUSES OF ACTION

### COUNT I

### False Claims Act, 31 U.S.C. § 3729, *et seq.*
### (Against Defendant)

75.     Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

76.     This is a civil action brought by Relator, on behalf of the United States of America against Defendant under the False Claims Act, 31 U.S.C. §3730(b)(1).

77.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval to officers, employees, or agents of the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

78.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false

- 15 -

or fraudulent records and/or statements to get false or fraudulent claims paid in violation of 31 U.S.C. § 3729(a)(1)(B).

79.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property in violation of 31 U.S.C. § 3729(a)(1)(G).

80.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(1)(G).

81.     The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, ACA subsidy payments to Defendant, including APTC payments, and may receive less than the total amount of funds owed to it by Defendant.

82.     As a result of Defendant's actions as set forth above, the United States has been, and may continue to be, damaged.

## COUNT II

**Violation of the State of Texas Medicaid Fraud Prevention Act,
Tex. Hum. Res. Code Ann. § 36.001 *et seq.***

83.     Plaintiffs-Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

84.     This is a civil action brought by Plaintiffs-Relators, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

- 16 -

85.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

86.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

87.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

88.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

89.     In addition, § 36.002(5) imposes liability on one who "knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product

- 17 -

or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program."

90.     Defendants violated § 36.002(5) by engaging in the conduct alleged herein.

91.     Defendants violated Hum. Res. Code § 36.002 by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and § 36.002(5) , compliance with which are express and implied conditions of payment for claims submitted to the State of Texas.

92.     The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

93.     As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant as follows:

A.     That Defendant be ordered to cease and desist from submitting any more false claims, or further violating the FCA and the Texas MFPA;

B.     That judgment be entered in the United States of America's favor and against Defendant in the amount of each and every false or fraudulent claim or retention of funds, multiplied as provided for in 31 U.S.C. § 3729(a)(1) and 42 U.S.C. § 18033(a)(6)(B), plus a civil penalty of not less $5,500 or more than $11,000 per claim or violation as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

- 18 -

C.      That judgment be entered in the State of Texas's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in the Texas MFPA, plus a civil penalty as provide din the Texas MFPA;

D.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.      That Defendant be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

F.      That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

G.      That Relator be granted such other and further relief as the Court deems just and proper.

## VIII.   **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

- 19 -

1311464.2

Dated: October 31, 2016                 Respectfully submitted,

                                        FISH & RICHARDSON PC

                                        By: _____
                                           Chad B. Walker
                                           Email: cbwalker@fr.com
                                           Texas Bar No. 24056484
                                           FISH & RICHARDSON P.C.
                                           1717 Main Street, Suite 5000
                                           Dallas, TX 75201
                                           (214) 747-5070 (Telephone)
                                           (214) 747-2091 (Facsimile)

                                           Nimish R. Desai (CA 244953)
                                           ndesai@lchb.com
                                           LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
                                           275 Battery Street, 29th Floor
                                           San Francisco, CA 94111-3339
                                           Telephone: 415.956.1000
                                           Facsimile: 415.956.1008

                                           Rachel Geman (NY RG 0998)
                                           LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
                                           250 Hudson Street, 8th Floor
                                           New York, NY 10013-1413
                                           Telephone: 212.355.9500
                                           Facsimile: 212.355.9592

                                           Kirk E. Chapman
                                           The Brian Krauss Law Firm
                                           910 17th Street NW, Suite 800
                                           Washington, DC 20006

                                        *Attorneys for Relator*

- 20 -

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

SEALED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES, ex rel. SHON O'REAR and on behalf of the STATE OF TEXAS

## DEFENDANTS
AMERICARE INFUSION CENTERS, LLC, AMERICARE INTEGRATED MANAGEMENT, LLC, AMERICARE MEDICAL PARTNERS, PLLC, AMERICARE MEDICAL GROUP, INC., CWIDA, INC., MICHAEL GENE SWAYDEN, and KELLY ROBERT SWAYDEN

**(b)** County of Residence of First Listed Plaintiff **COLLIN**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **DALLAS**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

RECEIVED
OCT 31 2016
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Chad B. Walker, Fish & Richardson, P.C., 1717 Main Street, Suite 5000, Dallas, TX 75201, 214.747.5070; Nimish R. Desai, Lieff Cabraser Heimann & Bernstein, LLP, 275 Battery St., 29th Fl., SF, CA 94111, 415.956.1000

Attorneys *(If Known)*

**3-16CV3039-L**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question *(U.S. Government Not a Party)*
☐ 2  U.S. Government Defendant
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☒ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
False Claims Act, 31 U.S.C. § 3729, et seq.
Brief description of cause:
False claims to government health insurance programs

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
10/31/2016

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY
RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____